## Roark v. Hogg, et al.

(Decided March 18, 1927.)

### Appeal from Harlan Circuit Court.

1. **Deeds.**—Where property was in name of husband and wife, evidence held to show that husband, after signing deed, delivered it to grantee for approval of form thereof only, but without intention of passing title.

2. Vendor and Purchaser.—Where deed was delivered to grantee only for approval of form thereof and not with intention to pass title, evidence that purchaser, having knowledge of grantor's subsequent sale of property, made no effort to secure delivery of deed or sued for specific performance or other relief held to show purchaser's abandonment of the deal.

3. Champerty and Maintenance.—Where defendant was not in possession of lot claimed by him, adversely or otherwise, at time of deed thereto to plaintiffs, in plaintiffs' suit to enjoin defendant's trespass plea of champerty, under Ky. Stats., section 210, was unavailing.

T. H. HOWARD and E. H. JOHNSON for appellant.

HALL, LEE & SNYDER for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

In the spring of 1924 Boyd Boggs was the owner of several contiguous lots in Poor Fork, now Cumberland, Kentucky. On a portion of these lots he had constructed a storehouse, dwelling, and theater building. The property was about to be sold at a master commissioner's sale under a judgment of court for the purpose of paying a vendor's lien, and perhaps other indebtedness of Boggs, and he was trying very hard to avoid this forced sale. At this time he was also indebted to appellant, Jonah Roark, for a wagon and some brick in the sum of $135, evidenced by a note. In early April, 1924, Boggs persuaded the appellant and one Whitaker to indorse his note for $350 for the purpose of discount at the Cumberland State Bank. Boggs promised to give the appellant a mortgage on the property above mentioned, to secure the appellant against any loss by reason of this indorsement. The parties met at the bank, executed the note, and the bank placed the proceeds of the note to the credit of Boggs. At the same time Mr. Helton, who was connected with the bank, made out the mortgage for Boggs to execute. While Mr. Helton was preparing the mortgage, Boggs and the appellant started negotiations for a sale by Boggs to the appellant of so much of Boggs' property as was unimproved. The parties finally came to a verbal agreement, whereby Boggs was to convey the unimproved property fronting 90 feet on Cumberland Street and running 50 feet with an alley, and the appellant was to pay him for it the sum of $2,500, by canceling the $135 note, by paying the $350 note when it came due, and by assum-

ing the vendor's lien amounting to $2,000; any balance
to be adjusted by a cash payment. Boggs testified that
Roark agreed to these terms on condition that he could
get the holders of the vendor's lien to grant him some
indulgence in its payment. The appellant denies this
and says that he was always ready, able and willing to
pay off the vendor's lien whenever demand for such pay-
ment should be made. At all events, Boggs prepared,
signed, and acknowledged a deed for the property which
he had verbally agreed to sell to Roark. He then took
it and placed it in Roark's hands. Roark claims that
Boggs, by doing this, delivered the deed to him with the
intention of passing title to the property covered by it.
The deed at this time was not signed by Boggs' wife.
Boggs, in his testimony, in response to this question on
cross-examination, "Who was this property deeded to,
you or your wife?" answered, "Deeded to both of us,"
and we find nowhere in this record any contradiction of
this statement. We must conclude, therefore, that Boggs
and his wife were joint owners of the property. Boggs
testified that he simply handed the deed to the appellant
to see if it was in proper form, and that he never intended
to deliver this deed at this time because it had not been
signed by his wife, and he had to go over, as the appel-
lant knew, into Letcher county where his wife then was
to obtain her signature. Appellant admitted that he re-
turned the deed to Boggs in order that Boggs might get
his wife to sign it. This Boggs did. On his return to
Poor Fork it was discovered by either Boggs or appel-
lant, there being some dispute in the record as to which
one did so, that the description of the property in the
deed Boggs had prepared extended on its 50-foot side
beyond the unimproved portion and onto the improved
portion, to a point about a foot under the theater build-
ing. So Boggs and the appellant agreed to reduce this
call in the deed from 50 feet to 49 feet, and that Boggs
should prepare another deed accordingly. This Boggs
never did. Boggs claims the reason why he never did
this was because appellant told him that he was unable
"to stave off" the holders of the vendor's lien and that
he could not finance the proposition, for which reason he
could not take the property. Appellant denies this in
toto, and says that he was always ready, able, and willing
to take the property and pay for it. The master commis-
sioner's sale above mentioned was rapidly approaching.

Boggs says that, since appellant would not take the property, he then had to sell his entire property comprising both the improved and unimproved parts, to his relatives, the appellees George and Ira Hogg, for $6,500. The Hoggs, although admitting that they knew that Boggs and the appellant had been on a dicker for the unimproved lots, deny that they knew that Boggs had sold the property to appellant. They said that Boggs informed them that the appellant had given up the deal because he was unable to finance it. They further say that after the sale to them was completed and their deed had been put to record, the appellant inquired of them what they had paid for the property, and when they told him, he responded that he could have got it for them for $6,200. Appellant's version of this conversation is that it occurred prior to the sale by Boggs to the appellees, and that he offered to obtain the property for the appellees for $6,200, plus $100 profit. When the $350 note fell due Boggs had made arrangements to pay it, but when the Hoggs, who were to pay it went to the bank for that purpose they discovered that the appellant had already been to the bank and discharged the note. This was some two or three months after the sale of the property to the appellees. In September, 1924, the appellees made a move to erect some buildings on these unimproved lots, and then for the first time, as this record indisputably shows, the appellant entered upon the lots and started himself to build some sheds and garages. The appellees at once brought this suit to enjoin him trespassing upon the property. On final hearing they were granted the relief they sought, and appellant has appealed.

Appellant insists that he is the owner of the unimproved lots in question because there was a delivery to him of the deed which described the property as running 50 feet along the alley, which delivery invested him with the title to the property, and that the appellees had taken their deed to the property with full knowledge of his rights and equities. Secondly, that the appellees were not entitled to the relief they sought because at the time the property was deeded to them he was in adverse possession of the lots and hence their deed was champertous. See Kentucky Statutes, section 210. Appellant presents by way of brief, though not by way of any issue raised by the pleadings, the further proposition that he is entitled to a lien on the property for the $500 he claims

he paid for the property in the cancellation of the $135 note and the payment of the $350 note. We think the evidence establishes that there was no delivery of the deed by Boggs to appellant with the intention of passing any title to him. As stated, the evidence shows that this lot was jointly owned by Boggs and his wife. The deed was not signed by Boggs' wife. Without such signature, appellant could not secure the full title to the property. This is what he bargained for, and this is undoubtedly what he wanted. Appellant admits that he returned the deed to Boggs for Boggs to get his wife's signature to the deed. All this corroborates Boggs that the purpose of his handing the deed to the appellant was not as a final delivery to pass title, but only to obtain his approval of the form of the deed. In Justice v. Peters, 168 Ky. 583, 182 S. W. 611, we said, with reference to the question of a delivery of a deed:

"The delivery may be actual or it may be a constructive delivery, but in either state of case the intent of the grantor to transfer the title to the grantee is essential and necessary to constitute a delivery. This intention to transfer the title must, however, be accompanied with some act of the grantor by which he parts with power and control over the deed for the benefit of the grantee, for intention alone will not constitute a delivery."

Boggs never parted with the power and control over the deed in question here for the benefit of Roark, nor did he intend, by the physical possession he permitted Roark to have of this deed, to pass the title to the property. It was solely for the purpose of examination. Further, we think that the evidence in this case shows that Roark did abandon the deal for the property. He made no effort from April until September ever to compel Boggs to make him another deed for this property, or to deliver the deed which had been made. He knew of the sale to the appellees within a few days after its consummation. He then made no complaint of it. He brought no suit for specific performance or to obtain any other relief. He made no arrangements to pay off the vendor's lien or "to stave them off" but stood by and permitted the Hoggs to discharge them. His whole conduct is inconsistent with his position that he had taken over this property. It is perfectly clear to our minds that Boggs' version of what transpired is correct.

So far as the plea of champerty is concerned, our statement of the facts of this case shows that the appellant had no possession of this lot, adverse or otherwise, at the time of the deed to the appellees. Hence his plea of champerty is unavailing.

We need not discuss appellant's claim for reimbursement of the $500 which he claims he paid for this property, first, because his agreement to cancel the $135 note and to pay the $350 was conditioned on his taking the property. When he did not do so, the $135 note remained uncanceled, and there was no obligation on appellant's part to pay the $350 note as principal. If he did pay this note later, he did so in his capacity as indorser. These two notes, then, were, in the light of appellant's abandonment of this trade, not paid by appellant on this land. Further, appellant presented no such issue and asked no such relief in his pleadings. The judgment of the lower court is correct, and it is affirmed.